## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CORTZ, INC., d/b/a In the Swim,    )
   )
             Plaintiff,    )
   )    Case No. 17 C 2187
          v.    )
   )
DOHENY ENTERPRISES, INC., and    )
TIM MURPHY,    )
   )
          Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, United States District Judge:

On May 5, 2017, Plaintiff Cortz, Inc., d/b/a In the Swim ("Cortz") filed a six-count First Amended Complaint for Injunctive and Other Relief against its former employee Tim Murphy ("Murphy") and Doheny Enterprises, Inc. ("Doheny Enterprises") alleging violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1831, *et seq.* (Count I), and the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.* (Count II), three breach of contract claims (Counts III-V), and a tortious interference with contract claim (Count VI). *See* 28 U.S.C. §§ 1331, 1367(a).

Before the Court is Cortz's renewed motion for a preliminary injunction brought pursuant to Federal Rule of Civil Procedure 65(a) in which Cortz focuses on its trade secret claims and two breach of contract claims alleged in the First Amended Complaint. The Court held a preliminary injunction hearing on June 28 and 29, 2017, at which time the following witnesses testified: (1) David Newman, Cortz's Executive Vice President of Finance; (2) Michael "Mick" Doheny, Vice President of Doheny Enterprises; (3) Timothy Murphy, Cortz's former Director of Purchasing; and (4) Rick Parise, a Category Director at Leslie's Pool Supplies. The parties

produced the following witness testimony through deposition designations: (1) John Doheny, President of Doheny Enterprises; (2) Brink Spruill, Vice President of Sales and Marketing at Kelley Technical Coatings ("Kelley"); and (3) Martin ("Marty") Mullarkey, President of Mullarkey Associates and a sales representative/agent for Kelley.

In assessing the parties' preliminary injunction arguments, the Court considered the totality of the evidence presented at the evidentiary hearing, including the deposition designations, and carefully examined the credibility of the witnesses. When assessing witness credibility, the Court considered each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and, significantly, the believability of the witness' testimony in light of the other evidence presented. *See Anderson v. City of Bessemer, N.C.,* 470 U.S. 564, 575 (1985); *Furry v. United States,* 712 F.3d 988, 993 (7th Cir. 2013). Further, the Court thoroughly analyzed the controlling legal authority.

With these standards in mind, Cortz has not met its burden of establishing the likelihood of success on the merits as to its breach of contract claim against Doheny Enterprises in relation to the November 30, 2015 Confidentiality Agreement, its DTSA and ITSA claims, and its breach of an employment contract claim against Murphy. Therefore, the Court, in its discretion, denies Cortz's motion for a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) ("A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need."). Further, the Court, in its discretion, grants Defendants' in limine motion limiting Rick Parise's testimony as inadmissible hearsay, as discussed in detail below. *See* Fed.R.Evid. 801(c).

## I.    Introduction

Cortz has been in business for over thirty years and provides swimming pool and spa-related products to residential and commercial customers across the United States.  (6/28/17, Newman Prelim. Inj. Hr'g.)[2]  Specifically, Cortz offers an assortment of merchandise, such as spa and pool chemicals, equipment, supplies, and parts, from different manufacturers and has its own branded products.  (*Id*.)  In addition, Cortz sells its products through a variety of different marketplaces and websites, such as Amazon and eBay.  (*Id*.)  Doheny Enterprises, which has been in business for fifty years, directly competes with Cortz and offers pool and spa chemicals, equipment, and accessories to customers across the United States.  (6/28 M. Doheny Prelim. Inj. Hr'g.)  Like Cortz, Doheny Enterprises sells its products through online marketplaces like Amazon and eBay, as well as through its own proprietary website and at its retail stores.  (*Id*.)

## II.    Prospective Purchase of Cortz

In November 2015, John Doheny, Doheny Enterprises' President, discovered that Cortz might be for sale.  (R. 84, J. Doheny Dep., at 40-41.)  More specifically, John Doheny learned that Lincoln International, LLC ("Lincoln") was acting as a broker for the sale of Cortz, after which he contacted a representative at Lincoln to express an interest in purchasing Cortz.  (*Id*. at

---

[1]   Although the parties filed numerous documents under seal, the Seventh Circuit has held that "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."  *In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010); *see also United States v. Foster,* 564 F.3d 852, 853 (7th Cir. 2009) (sealed documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").  Moreover, the Court does not discuss specific details of the parties' confidential information or the alleged trade secrets in this order.

[2]  The parties did not order an official transcript of the preliminary injunction hearing, therefore, the Court refers to the court reporter's unofficial transcript of the evidentiary hearing.

40-41.)  In connection with this inquiry, John Doheny signed a Confidentiality Agreement on behalf of Doheny Enterprises.  (*Id.* at 42.)  In particular, Doheny Enterprises' counsel forwarded the Confidentiality Agreement to John Doheny, who signed it on November 30, 2015.  (*Id.* at 42-43; Prelim. Inj. Hr'g Ex. 35, Confidentiality Agmt.)

Following the execution of the Confidentiality Agreement, in December 2015, an associate at Lincoln sent Cortz marketing materials to John Doheny and Doheny Enterprises' counsel.  (J. Doheny Dep., at 52-53; Prelim. Inj. Hr'g Ex. 39.)  In January 2016, John Doheny attended a meeting with Cortz's management team.  (J. Doheny Dep., at 53.)  The Cortz employees attending the January 2016 meeting were Steve Druckman (CEO), Eric Rohrdanz (COO), David Newman (CFO), and Christine Mattson (CMO).  (6/28 Newman Prelim. Inj. Hr'g; 6/29 M. Doheny Prelim Inj. Hr'g.)  Defendant Tim Murphy, Cortz's former Director of Purchasing, did not attend the January 2016 meeting and did not participate in any discussions with Doheny Enterprises regarding the potential sale of Cortz.  (6/29 M. Doheny Prelim Inj. Hr'g.)  At that time, however, John Doheny knew who Murphy was and that he worked for Cortz.  (J. Doheny Dep., at 51.)  Meanwhile, at the January 2016 meeting, Cortz distributed an information packet marked confidential to the following Doheny Enterprises' personnel attending the meeting – John Doheny (President), Mick Doheny (Vice President), and Brian Hendrickson (Vice President of Marketing).  (*Id*. at 30-31, 52-53.)

At some point after the January 2016 meeting, John Doheny expressed an interest in purchasing Cortz.  (J. Doheny Dep., at 55-56.)  Nonetheless, in February 2016, Cortz's counsel sent a letter to John Doheny – but not to Doheny Enterprises' counsel – explaining that because Doheny's participation in the sale had ended, John Doheny should destroy the confidential information provided by Cortz pursuant to paragraph 6 of the Confidentiality Agreement.  (*Id. at*

71-72.) According to John Doheny, upon receiving this letter, he destroyed the confidential information and contacted Mick Doheny and Brian Henderson directing them to do the same. (*Id.*) John Doheny specifically testified that because Doheny Enterprises' counsel had not attended the January 2016 meeting and had not received the packet of confidential information, he did not think to contact counsel and ask him to destroy any confidential documents that counsel might have. (*Id.* at 72-74.)

Leslie's Pool Supplies ("Leslie's") was the successful purchaser of Cortz, and around the end of June 2016, Leslie's closed on its acquisition of Cortz. (6/28 Newman Prelim. Inj. Hr'g.) Cortz is now a wholly-owned subsidiary of Leslie's. (*Id.*) At the preliminary injunction hearing, Newman testified that Leslie's paid approximately $7 million for Cortz, along with paying approximately $30 million in Cortz's debt. (*Id.*) Newman further explained that prior to Leslie's 2016 acquisition, more specifically from 2012 to 2016, Cortz's sales were steady, but its earnings were going down. (*Id.*) Newman also clarified that Leslie's yearly sales figures are about five times larger than Cortz's yearly sales. (*Id.*) Similarly, Mick Doheny testified at the preliminary injunction hearing that Leslie's is ten times larger than Doheny Enterprises. (6/29 M. Doheny Prelim. Inj. Hr'g.)

## III.    Murphy's Employment

Defendant Murphy began his employment with Cortz in April 1997 starting as a Store Assistant Manager. (6/29 Murphy Prelim. Inj. Hr'g.) At that time, Murphy entered into an employment agreement with Cortz. (*Id.*) During his employment at Cortz, Murphy worked his way up to the position of Cortz's Director of Purchasing. (*Id.*) When Murphy was the Director of Purchasing, his responsibilities included purchasing products from vendors and negotiating vendor agreements. (*Id.*) At the preliminary injunction hearing, Newman testified that as

Cortz's employee, Murphy had access to the costs of goods from its suppliers, the suppliers' rebate structures, and the suppliers' early-buy discount terms, as well as certain marketing strategies like bundling products for a discounted price. (6/28 Newman Prelim. Inj. Hr'g.) In particular, Newman testified that Murphy attended daily management meetings, at which time various Cortz officers and managers met with Cortz's CEO and reviewed what Newman characterizes as a "great sum of data." (*Id*.; Prelim. Inj. Hr'g Ex. 43.) Newman further elucidated that Murphy was privy to the daily flash report sent to approximately twenty-five to thirty other Cortz employees. (6/28 Newman Prelim. Inj. Hr'g.) Also, Newman stated that after Cortz fired Murphy, Murphy did not physically take any documents containing Cortz's trade secrets with him. (*Id*.)

Cortz terminated Murphy's employment on July 14, 2016. (*Id*.; 6/29 Murphy Prelim. Inj. Hr'g.) At the preliminary injunction hearing, Murphy explained that Cortz terminated his employment due in part to his refusal to sign a retention bonus agreement that Leslie's offered because it contained a two-year non-compete clause prohibiting him for working in the swimming pool supply industry if he left Leslie's employment or if Leslie's terminated his employment. (6/29 Murphy Prelim. Inj. Hr'g.) Murphy also testified that prior to rejecting the retention bonus, he had numerous conversations with Cortz and Leslie's, at which time he expressed his concerns about the two year non-compete clause. (*Id*.) Similarly, Newman testified that Cortz terminated Murphy's employment because Murphy would not sign the two year non-compete agreement. (6/28 Newman Prelim. Inj. Hr'g.)

After his termination, Murphy began looking for work and called Mick Doheny in July 2016. (*Id*.; 6/28 M. Doheny Prelim. Inj. Hr'g.) That phone call resulted in several meetings between Murphy and Mick Doheny. (6/28 M. Doheny Prelim. Inj. Hr'g.) Doheny offered to

hire Murphy as a re-buyer working with 14 vendors. (6/29 Murphy Prelim. Inj. Hr'g; 6/29 M. Doheny Prelim. Inj. Hr'g.) At the preliminary injunction hearing, Mick Doheny clarified that a re-buyer is tasked with looking at sales trends to build and then place orders for products with certain vendors. (6/28 M. Doheny Prelim. Inj. Hr'g.) Doheny Enterprises and Murphy agreed that Murphy would initially work as a consultant with the understanding that it was for a one-year trial period. (J. Doheny Dep., at 57-58; 6/28 M. Doheny Prelim. Inj. Hr'g.) Doheny Enterprises and Murphy signed a consulting agreement dated August 29, 2016 ("Consulting Agreement") and Murphy started working for Doheny Enterprises on September 6, 2016. (6/28 M. Doheny Prelim. Inj. Hr'g; Prelim. Inj. Hr'g Ex. 7 Consulting Agmt.) The Consulting Agreement affirmatively prohibited Murphy from using third-party confidential information in connection with his employment with Doheny. (Consulting Agmt. ¶ 10**.**)

## IV.    Vendor Pricing

At the preliminary injunction hearing, Rick Parise, a Leslie's employee who works with vendors, testified that he had a telephone conversation with Brink Spruill, an employee of pool supply vendor Kelley, sometime in February 2017. (6/29/17 Parise Prelim. Inj. Hr'g.) Parise testified that during this telephone conversation, Spruill brought to his attention that Murphy – who now works for Doheny Enterprises – had pressured Spruill about costs and vendor pricing. (*Id*.) Further, Parise testified that he talked to Spruill another time after the first conversation, although he did not recall the exact date. (*Id*.) During this second conversation, Parise told Spruill that Leslie's legal counsel had contacted him about the February 2017 telephone conversation. (*Id*.)

On the other hand, Brink Spruill testified at his deposition that he did not recall this conversation with Parise and that he has not talked to or e-mailed Murphy after Leslie's acquired

Cortz in June 2016. (R. 83, Spruill Dep., at 29-32, 39.) Not only did Spruill testify that he did

not remember any such conversation, but he specifically denied that he told Parise that Murphy

put pressure on him regarding vendor pricing or that he discussed Murphy putting pressure on

him with any other vendors. (*Id*. at 32-33.) Spruill also testified that no one at Doheny

Enterprises, including Murphy, has told him that they know the prices Cortz pays Kelley. (*Id*. at

60-61.)

Next, Cortz points to the ongoing three-year negotiation between Doheny Enterprises and

Kelley regarding the per gallon price of a product called "Zeron," which is an epoxy pool

coating. (R. 86, Mullarkey Dep., at 74; 6/28 M. Doheny Prelim. Inj. Hr'g.) In particular, in

November 2016, Kelley's agent, Marty Mullarkey, along with Mick Doheny and Brink Spruill,

exchanged a series of e-mails concerning Mick Doheny's request for lower Zeron prices from

Kelley. (Mullarkey Dep., at 76-81; 6/28 M. Doheny Prelim. Inj. Hr'g.) Shortly thereafter, in a

letter to Mick Doheny, Spruill mentioned Cortz (by its abbreviation ITS) and offered Doheny a

reduced price on the Zeron. (6/28 M. Doheny Prelim. Inj. Hr'g; Ex. 33, 11/17/16 Spruill Letter.)

Spruill specifically referenced Cortz as follows:

> Please consider that Kelley Technical Coatings has done some good things in support of
> the Doheny efforts to reach deep into the marketplace. For instance, we direct hundreds
> of callers to you when inquiring about purchasing Olympic, a very trusted brand. I
> believe our website to be superb and we will be ramping up our social media presence for
> the upcoming year, along with our ongoing marketing investments. I also think it
> important to mention we sent out at no charge over $43,000 in free goods plus freight last
> year to Doheny customers (we code them) for whatever complaint they were being
> unreasonable about, just to maintain a smooth relationship and faith in the line.
> Remember, Doheny grew 12% over the last 4 years where ITS [Cortz] flat lined.

(11/17/16 Spruill Letter.) Mick Doheny replied to Spruill's letter requesting an additional $4.00

per gallon price reduction on Zeron. (6/28 M. Doheny Prelim. Inj. Hr'g; Prelim. Inj. Hr'g Ex.

34, 11/22/16 e-mail.) Kelley eventually offered to reduce the price by an additional $2.00 a

gallon, which Mick Doheny accepted.  (6/28 M. Doheny Prelim. Inj. Hr'g.)   In explaining why

he asked for a lower per gallon price for Zeron, Mick Doheny testified that he requested a lower

price because he discovered through Cortz's advertising that Cortz was selling its self-branded

version of Zeron for a retail price of $69.99 a gallon, which was essentially Doheny Enterprises'

wholesale per gallon cost of the product.  (*Id.*)  Mick Doheny explained that "I just wanted a

better price on it because I couldn't sell it for what they were selling it for and not lose money."

(*Id.*)  Furthermore, Mick Doheny testified that Murphy was not involved in the Zeron price

negotiations and that Murphy never told him the vendor price that Cortz paid.  (*Id.*)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary equitable remedy that is available only

when the movant shows clear need."  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir.

2015); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d

1034, 1044 (7th Cir. 2017) ("A preliminary injunction is an extraordinary remedy.").  Moreover,

a preliminary injunction is "a way to maintain the status quo until merits issues can be resolved

at trial."  *Michigan v. U.S. Army Corp of Eng'rs,* 667 F.3d 765, 783 (7th Cir. 2011).  To obtain a

preliminary injunction, the moving party must show that (1) its claims have some likelihood of

success on the merits; (2) it will suffer irreparable harm prior to the final resolution of its claims;

and (3) legal remedies are inadequate.  *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053,

1058 (7th Cir. 2016); *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016).

"If the movant successfully makes this showing, the court must engage in a balancing

analysis, to determine whether the balance of harm favors the moving party or whether the harm

to other parties or the public sufficiently outweighs the movant's interests."  *Whitaker*, 858 F.3d

at 1044; *see also Jones*, 842 F.3d at 1058.  The balancing of harm "is done on a 'sliding scale'

measuring the balance of harms against the moving party's likelihood of success," namely, the "more likely he is to succeed on the merits, the less the scale must tip in his favor." *Whitaker,* 858 F.3d at 1054; *see also Jones*, 842 F.3d at 1060. "The converse, however, also is true: the less likely he is to win, the more the balance of harms must weigh in his favor for an injunction to issue." *Whitaker,* 858 F.3d at 1054. In sum, "[o]nce all the equitable factors are before the judge, [] a classic discretionary decision must be made involving how much weight to give individual components of the calculus and to what direction the balance of equity tips." *Jones*, 842 F.3d at 1060 (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)).

## ANALYSIS

The Court turns to the first preliminary injunction inquiry, namely, whether Cortz's claims have some likelihood of success on the merits, because it is dispositive. "[T]he threshold for demonstrating a likelihood of success on the merits is low." *Rhoades,* 825 F.3d at 338; *see also Whitaker,* 858 F.3d at 1046. As the Seventh Circuit teaches, "[i]n framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible." *Rhoades,* 825 F.3d at 338. Put differently, "[t]o demonstrate the requisite likelihood of success," the moving party need "only to present a claim plausible enough that (if the other preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step." *U.S. Army Corps of Eng'rs*, 667 F.3d at 783.

## I.     Breach of Confidentiality Agreement (Count III)

Because the parties' legal memoranda focus on the November 30, 2015 Confidentiality Agreement that Doheny Enterprises entered into during its discussions to purchase Cortz, the

Court begins its analysis with Cortz's claim that Doheny Enterprises breached this agreement. At issue is the non-solicitation clause of the Confidentiality Agreement, which reads in its entirety:

> For a period of two (2) years from the date of this Agreement, we and our Representatives (excluding our Professional Advisors so long as such Professional Advisors are not acting on our behalf with respect to the restrictions set forth in this paragraph 3) agree not to directly or indirectly solicit for employment or employ any Employees of the Company. The foregoing will not restrict us from soliciting or hiring any Employee (other than a management-level employee) of the Company who: (a) responds to a public general advertisement or non-directed search inquiry (in each case not directed at or targeted to, the Company or any of the Company's employees), or (b) is referred to us by search firms (in each case not directed at, or targeted to, the Company or any of the Company's Employees). "Employees" shall be defined as any management level employee of the Company, or any other employee of the Company with whom we or any of our Representatives have direct contact or who becomes known to us or any of our Representatives in connection with the Potential Transaction.

(R. 34-1, Ex. A, Confidentiality Agmt. ¶ 3.) Also at issue is paragraph six of the Confidentiality Agreement, which states in relevant part:

> Promptly upon a written request by or on behalf of the Company, we agree to destroy (and we shall confirm all such destruction in writing by an authorized signatory) all Confidential Information in our or our Representatives' possession or to which either we or our Representatives have access.

(*Id.* ¶ 6.)

The Confidentiality Agreement calls for the application of Delaware law. (*Id.* ¶ 9.) In Delaware, the elements of a breach of contract claim are: "[1] the existence of the contract, whether express or implied; [2] the breach of an obligation imposed by that contract; and [3] the resultant damage to the plaintiff." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 389 (3d Cir. 2016) (quoting *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). "If a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning." *Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 256, 259-60 (D. Del. 2015). "Only if the contract is ambiguous may a court consider extrinsic evidence of

the parties' intent." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir.

2015) (citing *O'Brien v. Progressive No. Ins. Co.,* 785 A.2d 281, 288-89 (Del. 2001)). "In

looking at extrinsic evidence to interpret an ambiguous contractual provision, 'a court may

consider evidence of prior agreements and communications of the parties as well as trade usage

or course of dealing.'" *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 362 (3d Cir. 2014)

(quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232-33 (Del. 1997)).

Cortz admits that the non-solicitation clause in paragraph three of the Confidentiality Agreement

is a restrictive covenant, (*see* R. 7, 3/21/17 Brief, at 6), and "Delaware courts construe restrictive

covenants narrowly as written." *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, No.

CIV.A. 7844-VCP, 2013 WL 1821608, at *9 (Del. Ch. May 1, 2013).

### A. Non-Solicitation Clause

Cortz first argues that Doheny Enterprises breached the non-solicitation clause in

paragraph three of the Confidentiality Agreement when it hired Murphy within two years of the

November 30, 2015 Confidentiality Agreement even though Murphy no longer worked for Cortz

at that time. In making this argument, Cortz asks the Court to consider testimony provided by

Brad Keyworth, who was part of the Lincoln Financial team working to find buyers for Cortz in

2015-16. More specifically, Cortz argues that the language in paragraph three is not ambiguous

and that both current and past management employees are covered under paragraph three based

on trade usage as described by Keyworth. In Delaware, however, trade usage is extrinsic

evidence that courts examine only if the contract language is ambiguous. *See Aleynikov*, 765

F.3d at 362; *Cont'l Warranty,* 108 F.Supp.2d at 260; *Eagle Indus.,* 702 A.2d at 1233; *United*

*Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007); *see, e.g., Motorola Inc.*

*v. Amkor Tech., Inc.*, 958 A.2d 852, 858 (Del. 2008) ("the Superior Court looked to trade usage

as a source of resolving the contract ambiguity.").  Here, neither Cortz nor Doheny Enterprises

argue that the non-solicitation clause in the Confidentiality Agreement is ambiguous, although

they point to extrinsic evidence in making their arguments.

The Court thus turns to the plain language of the Confidentiality Agreement keeping in

mind that in Delaware "[r]estrictive covenants are carefully negotiated and our law requires that

their unambiguous terms be given effect."  *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910

A.2d 1020, 1024 (Del. Ch. 2006).  In paragraph three, Doheny Enterprises agreed "not to directly

or indirectly solicit for employment or employ any Employees of the Company."  The agreement

also states "'Employees' shall be defined as any management level employee of the Company, or

any other employee of the Company with whom we or any of our Representatives have direct

contact or who becomes known to us or any of our Representatives in connection with the

Potential Transaction."  The Court notes that this language defines employee in the present tense.

In response to Cortz's motion, Doheny Enterprises argues that because Cortz had

terminated Murphy's employment before Doheny Enterprises had hired him, it did not breach the

Confidentiality Agreement as the non-solicitation clause only covered current management

employees.  In making its argument, Doheny Enterprises asserts that the definition of employee

in Black's Law Dictionary does not include a person who once worked for an employer.  *See*

*Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 738 (Del. 2006) (en banc)

("Delaware courts look to dictionaries for assistance in determining the plain meaning of terms

which are not defined in a contract.").  In particular, Black's Law Dictionary defines employee

as "[s]omeone who works in the service of another person (the employer) under an express or

implied contract of hire, under which the employer has the right to control the details of work

performance."  *Employee*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The Court agrees

that the plain language of the Confidentiality Agreement concerns current employees based on the contract language and the dictionary definition, which are in the present tense."[3]  That Cortz now asks the Court to rewrite this plain language to include past employees contradicts well-settled Delaware law.  *See Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 564 (D. Del. 1993) ("Courts should not rewrite the plain language of 'an otherwise valid contractual provision,' even to supply perceived omissions.") (citation omitted); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998) ("it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."); *see, e.g., Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp. 3d 336, 343 (D. Del. 2016).  Also important, Cortz's broad interpretation of the non-solicitation clause – which Cortz admits is a restrictive covenant – contradicts Delaware law which instructs courts to construe restrictive covenants narrowly.  *See Smartmatic Int'l Corp.,* 2013 WL 1821608, at *9; *see also New Castle Cty. v. Pike Creek Recreational Servs., LLC*, 82 A.3d 731, 748 n.124 (Del. Ch. 2013) ("restrictive covenants should be strictly construed and narrowly read").

Examining the undisputed evidence in the record, Doheny Enterprises did not solicit or hire Murphy while he was Cortz's employee.  Rather, Murphy contacted Doheny Enterprises and Doheny Enterprises hired Murphy after Cortz had terminated Murphy's employment on July 14, 2016.  The undisputed evidence further reveals Doheny Enterprises offered Murphy the position of consultant for a one-year trial period in August 2016.  Murphy then started working for Doheny Enterprises on September 6, 2016.  Under these facts, Cortz has not met its burden of

---

[3] Likewise, the Oxford English Dictionary defines "employee" in the present tense, namely, "[a] person employed for wages." 5 Oxford English Dictionary 191 (2d ed. 1989); *see also Employee,* New Oxford American Dictionary 569 (3d ed. 2010) ("a person employed for wages or salary").

establishing that its chances of succeeding on the breach of the non-solicitation clause are better than negligible. *See Rhoades,* 825 F.3d at 338; *U.S. Army Corps of Eng'rs*, 667 F.3d at 783.

**B.  Paragraph Six**

Cortz further argues that although John Doheny ensured that Doheny Enterprises and its representatives would destroy Cortz's sales materials and confidential information after the sale process ended, he failed to direct Doheny Enterprises' attorneys to destroy the confidential information, and thus Doheny Enterprises breached paragraph six of the Confidentiality Agreement.  Indeed, John Doheny admits that he failed to contact counsel to destroy the materials Cortz provided to Doheny.  Specifically, at his deposition, John Doheny testified that because Doheny's counsel had not attended the January 2016 meeting with Cortz and had not received the detailed packet of Cortz's confidential information provided at that time, he did not think to contact counsel and ask him to destroy any confidential documents.  Meanwhile, at the preliminary injunction hearing, Newman testified that there was no harm or damage to Cortz based on counsel's failure to destroy the documents at issue.  (6/28 Newman Prelim. Inj. Hr'g; Prelim. Inj. Hr'g Ex. 39.)  As such, Cortz has not presented evidence of any injury, which is a required element of a breach of contract claim under Delaware law.  *See Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015).

Moreover, Doheny Enterprises has offered to destroy these documents, which is a remedy contemplated by the Confidentiality Agreement, namely, specific performance.  (Confidentiality Agmt. ¶ 8.)  Thus, pursuant to the Confidentiality Agreement, the Court directs Doheny Enterprises to destroy these documents and "confirm all such destruction in writing by an authorized signatory."  Accordingly, Cortz has failed in its burden of demonstrating that its chances of succeeding on its breach of contract claim based on paragraph six of the

Confidentiality Agreement are better than negligible due to lack of harm or injury. *See Rhoades,* 825 F.3d at 338; *see also U.S. Army Corps of Eng'rs*, 667 F.3d at 783.

**II.     Trade Secret Claims (Counts I and II)**

Cortz further argues that Doheny Enterprises and Murphy have misappropriated its trade secrets. Specifically, in Count I of the First Amended Complaint, Cortz brings a trade secret misappropriation claim under the Defend Trade Secrets Act of 2016 ("DTSA"), which creates a private cause of action in favor of the "owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). *See Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 919-20 (N.D. Ill. 2016). Under the DTSA:

> (3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if –
>
>> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>>
>> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). In addition, under the DTSA, "misappropriation" is defined as "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Mission Measurement*, 216 F. Supp. 3d at 920 (citation omitted).

In Count II, Cortz alleges a trade secret misappropriation claim under the Illinois Trade Secrets Act ("ITSA"). "In order to establish improper use of trade secrets, a plaintiff must show: '(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation.'" *Destiny Health, Inc. v. Connecticut Gen. Life Ins. Co.*, 39 N.E.3d 275, 282 (1st Dist. 2015) (citation omitted); *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 721 (7th Cir. 2003) ("To prevail on a claim for misappropriation of a trade secret under the Act, the plaintiff must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business."). Under the ITSA,

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that
>
> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*See* 765 ILCS 1065/2(d); *Triumph Packaging Grp. v. Ward,* 834 F.Supp.2d 796, 806 (N.D. Ill. 2011). Under the ITSA, the Court may enjoin actual or threatened misappropriation of trade secrets. *See* 765 ILCS 1065/3(a); *Triumph Packaging,* 834 F.Supp.2d at 806.

Without referring to the ITSA's or DTSA's specific definitions of "trade secret," Cortz maintains that "[f]inancial information, such as information related to online strategy formation, development, and implementation, vendor negotiation information, information related to customer pricing and profit margins, and cost margins in online marketplaces, plainly constitutes a trade secret under the DTSA and the ITSA." (R. 7, 3/21/17 Brief, at 4.) In making this argument, Cortz cites this Court's decision in *Mission Measurement,* which does not support

Cortz's contention that this information "plainly" constitutes a trade secret or "falls squarely" within the statutes' definitions of trade secret. Indeed, as the Seventh Circuit instructs, "[i]t is not enough to point to broad areas of [information] and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (per curiam).

Under this guidance, the definition of trade secret is not as simple as Cortz suggests. As the Seventh Circuit teaches, "a trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Learning Curve Toys,* 342 F.3d at 723 (citation omitted). "In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances." *Id.* In making this ad hoc evaluation, Illinois courts often refer to six factors in deciding whether a trade secret exists:

> (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* at 722; *see also Mangren Research & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 942 (7th Cir. 1996) (Under Illinois law, "the information at issue 'must be sufficiently secret to impart economic value to both its owner and its competitors because of its relative secrecy.'") (citation omitted).

In its reply brief and at the preliminary injunction hearing, Cortz added specificity as to what it considers its trade secrets. In doing so, Cortz discusses its vendor pricing. Specifically, Cortz highlights Leslie's December 31, 2011 vendor agreement with Kelley noting that it contains a confidentiality clause concerning the confidential and/or proprietary information disclosed by the parties. (Prelim. Inj. Hr'g Ex. 42, 12/31/11 Vendor Agmt. ¶ 7.) The fact that

Leslie's – not Cortz – and Kelley entered into a vendor agreement with a confidentiality clause provides some evidence that vendors take affirmative steps to maintain the secrecy and confidentiality of their vendor pricing. *See Learning Curve Toys*, 342 F.3d at 725-26; *Arcor, Inc. v. Haas*, 363 Ill. App. 3d 396, 402 (1st Dist. 2005.) Cortz also provides additional evidence about vendor practices concerning the confidentiality of vendor prices, including Marty Mullarkey's deposition testimony that Mullarkey Associates keeps vendor prices confidential by not sharing this information with anyone outside of the customer and the supplier involved in the transaction. (Mullarkey Dep., at 21-22.) In addition, Cortz entered into non-disclosure agreements with Doheny Enterprises and Murphy, which is evidence that Cortz took steps to maintain its confidential information's secrecy. *See Cumulus Radio Corp. v. Olson*, 80 F. Supp. 3d 900, 911 (C.D. Ill. 2015); *see, e.g., Mission Measurement,* 216 F. Supp. 2d at 922. As such, Cortz has presented some evidence that "the real value of the information 'lies in the fact that it is not generally known to others who could benefit [from] using it.'" *Mangren Research*, 87 F.3d at 942 (citation omitted).

That being said, Cortz has not presented evidence regarding other relevant factors addressed by the Seventh Circuit in *Learning Curve Toys* or case law discussing the ITSA's or DTSA's definitions of trade secret in relation to its vendor pricing. Cortz, for example, does not discuss the amount of time, effort, or the money that it expended in developing its vendor pricing nor whether it would be difficult to duplicate its effort in doing so. *See Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 791 (1st Dist. 2002) ("Where information can be readily duplicated without involving considerable time, effort or expense, it is not a trade secret."); *see also Mangren Research,* 87 F.3d at 942 (first statutory requirement under ITSA "precludes trade secret protection for information generally known within an industry even if not

to the public at large."); *see, e.g.*, *Arcor, Inc.*, 363 Ill. App. 3d at 401-02 (lengthy process in obtaining customers fulfilled first requirement under ITSA).

Rather than developing its argument as to how vendor pricing constitutes a trade secret under the ITSA's or DTSA's definitions of trade secret, at the preliminary injunction hearing, Cortz offered evidence that Murphy and about thirty of his co-workers were privy to a "great sum of data" on a daily basis, that Cortz has approximately 400 vendors and 20,000 different products or SKUs, and the vendor pricing as to these 20,000 products is relevant for about two to three years. (6/28 Newman Prelim. Inj. Hr'g.) Likewise, Doheny Enterprises has well over 30,000 products/SKUs and approximately 300 to 500 vendors. (6/29 M. Doheny Prelim. Inj. Hr'g.) Cortz also presented testimony that Murphy did not take any physical documents with him, such as the voluminous daily flash reports, after Cortz fired him, and that it is unlikely that Murphy would remember Cortz's thousands of different vendor prices. (6/28 Newman Prelim. Inj. Hr'g.) Murphy also testified that he did not take any physical documents with him when he left Cortz, did not remember Cortz's specific vendor pricing, and did not remember the data reflected in the "humongous" daily flash reports. (Murphy Prelim. Inj. Hr'g.)

In any event, assuming that Cortz's vendor pricing is a trade secret as defined by both the DTSA and ITSA, Cortz must present some evidence that Doheny Enterprises or Murphy misappropriated this trade secret. In support of this requirement, Cortz explains that it can establish misappropriation through Rick Parise, a Leslie's employee, who testified that he had a February 2017 telephone conversation with Brink Spruill, a Kelley's employee. At the preliminary injunction hearing, Parise testified that during this February 2017 telephone conversation, Spruill told him that Murphy had pressured Spruill about costs and vendor pricing. Parise's testimony is textbook hearsay offered for the truth, and Cortz has failed to offer a

hearsay exception.  *See* Fed.R.Evid. 801(c); *see, e.g., United States v. Walker*, 673 F.3d 649, 657 (7th Cir. 2012).

On the other hand, Brink Spruill testified at his deposition that he did not recall this conversation with Parise and that he had not talked to Murphy after Leslie's had acquired Cortz in June 2016.  Further, not only did Spruill testify that he did not remember any such conversation with Parise, but he specifically denied that he told Parise that Murphy put pressure on him regarding vendor pricing or that he discussed Murphy putting pressure on him with other vendors.  Spruill also stated that no one at Doheny Enterprises, including Murphy, has told him that they know the vendor prices that Cortz pays Kelley.  Likewise, Mick Doheny testified at the hearing that Murphy never told him the vendor price Cortz paid for Zeron.  Thus, even if Parise's testimony was not inadmissible hearsay, his testimony lacks credibility based on the other evidence presented at the preliminary injunction hearing and Parise's demeanor while testifying. *See Kramer v. Am. Bank & Trust Co., N.A.*, 989 F. Supp. 2d 709, 711 (N.D. Ill. 2013) ("demeanor and inflection can be critical components of the decision whether to believe a witness").

Furthermore, Cortz contends that the second instance of trade secret misappropriation involved ongoing negotiations between Doheny Enterprises and Kelley regarding the per gallon price of a product called "Zeron," which is an epoxy pool coating.  In particular, in November 2016, Kelley's agent, Marty Mullarkey, along with Mick Doheny and Brink Spruill, exchanged a series of e-mails concerning Mick Doheny's request for lower Zeron prices.  Thereafter, in a November 17, 2016 letter to Mick Doheny, Spruill mentioned Cortz (by its abbreviation ITS) and offered Doheny Enterprises a reduced price on the Zeron.  Mick Doheny replied to Spruill's

letter requesting an additional $4.00 per gallon price reduction. In the end, Kelley offered to reduce the price by $2.00 a gallon, which Mick Doheny accepted.

Cortz asserts that Mick Doheny's request for the additional $4.00 price reduction for Zeron indicates trade secret misappropriation because a $4.00 reduction would bring Doheny Enterprises' wholesale cost of Zeron suspiciously close to what Cortz pays Kelley for its similar, self-labeled epoxy paint. It also appears that Cortz is arguing that because Spruill mentioned Cortz's growth had "flat lined" in his November 17, 2016 letter to Mick Doheny, something is amiss. In explaining why he asked Kelley for a lower per gallon price for Zeron, Mick Doheny testified that he did so because he discovered that Cortz was selling Zeron at a retail price which was essentially Doheny Enterprises' wholesale cost of the product. He further explained that "I just wanted a better price on it because I couldn't sell it for what they were selling it for and not lose money." (*Id.*) In addition, Mick Doheny testified that Murphy was not involved in the Zeron price negotiations and that Murphy never told him the Zeron vendor price that Cortz paid. After observing Mick Doheny's demeanor, facial expressions, and knowledge of the matters to which he testified, the Court concludes that his testimony is credible. *See Nomanbhoy Family Ltd. P'ship v. McDonald's Corp.*, 579 F. Supp. 2d 1071, 1088 (N.D. Ill. 2008) ("Demeanor can be a significant component of credibility and related determinations.").

Next, Cortz suggests that it is inevitable that Murphy will continue to use and disclose Cortz's trade secrets on behalf of Doheny Enterprises, and thus there is a threatened misappropriation of its trade secrets. *See Saban v. Caremark Rx, L.L.C.,* 780 F.Supp.2d 700, 734 (N.D. Ill. 2011). The inevitable disclosure doctrine allows a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th

Cir. 1995); *see also Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 1069, 251 Ill.Dec. 595, 740 N.E.2d 1166 (1st Dist. 2000) ("*PepsiCo* correctly interprets Illinois law and [we] agree that inevitable disclosure is a theory upon which a plaintiff in Illinois can proceed under the [Illinois Trade Secrets Act]."). "[T]he mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose ... trade secret information' so as to 'demonstrate irreparable injury.'" *PepsiCo,* 54 F.3d at 1269 (quotation omitted).

Because Cortz did not develop its inevitable disclosure argument in its legal memoranda, at the preliminary injunction hearing, the Court asked Cortz's counsel what evidence supports its argument of that there is a threatened or inevitable use of its alleged trade secrets. In response, counsel explained that evidence supporting inevitable or threatened use includes that Mick Doheny and Murphy have a close working relationship and that the "information, pricing, what sells well, what doesn't sell well," is "information that goes to directly to the job Mr. Murphy is doing for them." (6/29 Closing, Prelim. Inj. Hr'g.) Counsel further asserted that "the combination of past violations plus the nature of the working relation and the information [Murphy] knows as its relates to the job he's doing for Doheny's makes it inevitable that if that relationship is allowed to continue, the information will continue to be passed." (*Id.*)

As discussed above, Cortz has failed to set forth evidence of any "past violations" in relation to its alleged trade secrets. Also important, Mick Doheny credibly testified that Murphy does not negotiate vendor pricing as part of his re-buying duties at Doheny Enterprises and that Murphy has not discussed Cortz's vendor pricing with him. Also, Murphy credibly testified that he does not negotiate vendor pricing as a re-buyer for Doheny Enterprises. (6/29 Murphy Prelim. Inj. Hr'g.) Thus, what remains is Cortz's conjecture that Murphy might use Cortz's

alleged trade secrets in his new position because Cortz uses eleven of the fourteen vendors Murphy works with when Murphy builds orders for Doheny Enterprises. It is well-established, however, that an "employer's fear that its former employee will use the trade secrets in his new position is insufficient to justify application of the inevitable disclosure doctrine." *Triumph Packaging Grp.*, 834 F. Supp. 2d at 809. In addition, Newman testified that Leslie's negotiates vendor prices and purchases 80 percent of Cortz's products, which leads to a reasonable inference that Cortz's former vendor pricing for these products may no longer relevant.

In a similar vein, at the preliminary injunction hearing, the Court asked Cortz's counsel to explain its other trade secrets beyond vendor pricing. Counsel responded that other trade secrets included "the products that sell really well or sell not so well," which, on its face, lacks sufficient specificity. *See Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) ("specificity of concrete trade secrets is required to support a finding of misappropriation"). Counsel nevertheless points to Newman's preliminary injunction hearing testimony about Cortz selling aqua quartz silica sand and that Murphy was involved in purchasing this product for Cortz and knows that it sells well. Doheny Enterprises now offers this product through its catalog. (6/29 M. Doheny Prelim. Inj. Hr'g.) At the preliminary injunction hearing, Mick Doheny explained that Doheny Enterprises has been selling sand for years, but it never put the sand in its catalog before because it costs more to buy it from the catalog than buying it directly from its retail stores due to freight costs. (*Id.*) Further, Mick Doheny stated that he put this product in Doheny Enterprises' catalog because he saw it in Cortz's catalog. (*Id.*) Mick Doheny's explanation is not only credible, but Cortz has not presented any evidence that Murphy shared Cortz's vendor pricing of aqua quartz silica sand

with Mick Doheny in the first instance. Therefore, Cortz's argument regarding aqua quartz silica sand is unavailing at this juncture.

Although Murphy testified at the preliminary injunction hearing that he sent certain documents to his home e-mail account in 2012 or 2013 because he could not remotely access Cortz's server, there is no other evidence in the record that Murphy physically took any documents from Cortz, let alone Cortz's alleged trade secrets, except for what little he remembers. Furthermore, evidence in the record suggests what Murphy remembers about Cortz's vendor pricing would be stale at this point or irrelevant now that the larger Leslie's negotiates 80 percent of Cortz's vendor pricing  *See*, *e.g., Saban,* 780 F.Supp.2d at 714. Indeed, as the *Saban* decision explains, "[t]he protections afforded to trade secrets reflects a balancing of conflicting social and economic concerns." *Id.* at 734 (citing *Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill. App. 3d 447, 452 (1989)). The Illinois Appellate Court has reasoned as follows:

> On one hand, an employer who has invested time, money and effort in developing a secret advantage should be protected from a former employee who obtains the secret through improper means. On the other hand, the court must recognize that in a society based on competition, the employee has a right to make use of the general knowledge and skills acquired through experience in pursuing the occupation for which he is best suited.

*Minogue*, 180 Ill. App. 3d at 452 (internal citation omitted).

Considering these concerns in the context of the evidence presented, Cortz has failed in its burden of establishing the relatively low threshold that its chances of succeeding on its trade secrets claims are better than negligible at this juncture. *See Rhoades,* 825 F.3d at 338. In other words, Cortz's trade secret claims are not plausible based on the evidence before the Court. *See U.S. Army Corps of Eng'rs*, 667 F.3d at 783; see also *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 726 (7th Cir. 2009) (movant must have "a plausible theory on the merits—not necessarily a winning one.").

### III.     Breach of Non-Disclosure Agreement (Count IV)[4]

In Count IV, Cortz brings a breach of contract claim against Murphy based on his employment agreement dated April 29, 1997.  Although Cortz failed to move Murphy's 1997 employment agreement into evidence at the preliminary injunction hearing, Murphy testified that he signed the 1997 employment agreement in which he promised not to use or disclose Cortz's confidential information.  (6/29 Murphy Prelim. Inj. Hr'g.)  Moreover, the parties discuss Murphy's 1997 employment agreement in their legal memoranda.

In support of its motion for a preliminary injunction, Cortz argues that based on Spruill's telephone call with Parise and the negotiations for the price of Zeron, Murphy violated his 1997 employment agreement with Cortz.  As discussed above, however, Parise's testimony is inadmissible hearsay and Mick Doheny's well-reasoned explanation of the price negotiations for Zeron belie Cortz's argument.  Further, Cortz contends that it "need not wait until Murphy actually again uses Cortz's confidential information" because "[h]e has demonstrated that he will continue to use and disclosed Cortz's confidential information on behalf of Doheny."  (R. 43, Supp. Brief, at 14-15.)  Not only does this argument lack an evidentiary basis, but Cortz has not cited any legal authority that the inevitable disclosure doctrine applies to breach of contract claims and the Court found none.  Accordingly, Cortz has failed in its burden of showing that its chance of succeeding on its breach of the 1997 employment contract claim is better than negligible due to lack of evidence supporting this claim.  *See Rhoades,* 825 F.3d at 338; *U.S. Army Corps of Eng'rs*, 667 F.3d at 783.

---

[4] In its legal memoranda and in Count V, Cortz alleges that Murphy also breached a "Form of Parent Exchange and Subscription Agreement" in which Murphy agreed to be bound by the In the Swim Holdings Limited Liability Company ("LLC") Agreement dated March 31, 2008. Cortz did not address or develop this argument at the preliminary injunction hearing.

**CONCLUSION**

Because Cortz has not met its burden of establishing the likelihood of success on the merits as to its breach of contract claim against Doheny Enterprises in relation to the November 30, 2015 Confidentiality Agreement, its DTSA and ITSA claims, and its breach of the 1997 employment contract claim against Murphy, the Court, in its discretion, denies Cortz's motion for a preliminary injunction.   Also, the Court, in its discretion, grants Defendants' in limine motion limiting Rick Parise's testimony as inadmissible hearsay.

**Dated:**  July 11, 2017

**ENTERED**

**AMY J. ST EVE**
**United States District Court Judge**